## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA ANN CONSTANTINO, | ) | CASE NO. 1:20cv767 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff Patricia Ann Constantino ("Plaintiff" or "Constantino"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

On January 22, 2016, Constantino filed an application for DIB, alleging a disability onset date of December 28, 2015, and claiming she was disabled due to Common Variable Immune Deficiency ("CVID"), mannose-binding lectin, lupus, Hashimoto's, migraines, cervical issues, depression, anxiety, dizziness, and neuropathy.  (Transcript ("Tr.") at 87-88.)  The application was denied initially and upon reconsideration, and Constantino requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 139.)

On January 30, 2018, an ALJ held a hearing, during which Constantino, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 15-53.)  On January 28, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 57-82.)  The ALJ's decision became final on February 28, 2020, when the Appeals Council declined further review. (Tr. 1-3.)

On April 9, 2020, Constantino filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17, 18.)  Constantino asserts the following assignment of error:

> (1)  The ALJ erred by failing to properly evaluate the treating medical opinion consistent with the regulations, Agency policy and Sixth Circuit precedent.

(Doc. No. 1 at 1.)

# II.  EVIDENCE

## A.  Personal and Vocational Evidence

Constantino was born in August 1966 and was 51 years-old at the time of her administrative hearing. (*Id*. at 87.)  At the time of her application for benefits she was a younger individual; however, she changed age categories to an "individual closely approaching advanced age" (age

2

50-54) prior to the ALJ's decision. (*Id*. at 87, 82.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has

a high school education and is able to communicate in English.  (*Id.* at 81.)  She has past relevant

work as a pharmacy technician.  (*Id*.)

**B.     Relevant Medical Evidence[2] - Physical Impairments**

> **i.        Before December 28, 2015**

On April 7, 2014, a CT scan of Constantino's chest showed a stable nodule in the right lower

lobe (compatible with a benign scar), no areas of bronchiectasis, mild degenerative changes of the

thoracic spine, and mild levoscoliosis of the lower thoracic spine. (*Id*. at 824.)

On August 15, 2014, an x-ray of Constantino's chest showed mild levoconvex curvature and

multilevel degenerative changes of the thoracic spine, with no focal airspace consolidation or pleural

effusion. (*Id*. at 634.)

On November 3, 2014, Dr. Colleen Tomcik evaluated an MRI of Constantino's cervical

spine.  Dr. Tomcik noted a broad-based posterior disc herniation that narrows the subarachnoid

space but does not deform the cord and moderate bilateral neural foraminal stenosis at C4-C5;

broad-based posterior disc herniation asymmetrical to the left that narrows the subarachnoid space

but does not deform with cord and moderate to severe bilateral neural foraminal stenosis at C5-C6;

and central disc herniation that narrows the subarachnoid space but does not deform the cord at

C6-C7. (*Id*. at 826.)

In May 2015, Constantino underwent a thyroid ultrasound.  (*Id*. at 292-93.)  Dr. Jay Morrow

noted she presented in no acute distress and the ultrasound revealed Constantino had "very small

---

[2]     The Court's recitation of the medical evidence is not intended to be exhaustive
and is limited to the evidence cited in the parties' Briefs. Because Constantino
does not assert any error relating to the mental impairment portion of the ALJ's
RFC finding, evidence related to that finding is omitted herein.

multinodular thyroid" with nodules shrinking since 2011 and no other significant limitations or conditions.  (*Id*.)

On June 15, 2015,  spirometry testing showed a FEV1 of 1.99 (70% of predicted) and a FVC of 2.37 (67% of predicted), consistent with moderate restriction. (*Id*. at 293.) The results of this study were described as "a little low." (*Id*. at 317.)

On November 2, 2015, spirometry testing showed a FEV1 of 1.81 (64% of predicted) and an FVC of 2.16 (61% of predicted), consistent with moderate restriction.  (*Id*. at 296-97.) Examination notes document postnasal drip, clear lungs, and no swelling, tenderness or edema in the extremities. Tr. 323.  She was restarted on Symbicort and given Augmentin for 14 days; she was also given a sample of ProAir to take as needed. (*Id*. at 324.)

On November 30, 2015, spirometry testing showed a FEV1 of 1.93 (70% of predicted) and a FVC of 2.33 (66% of predicted), which was described as "much improved." (*Id*. at 297, 327.) Examination notes document moist mucosa, clear lungs bilaterally, and no swelling or tenderness in her extremities. (*Id*. at 326.) She was assessed with moderate persistent asthma. (*Id*.)

### ii.       After December 28, 2015

On January 28, 2016,Coinstantino was treated by Dr. Tomcik, who noted that the health issue reviewed was "classical migraine with intractable migraine."  (*Id*. at 520, 741.) Dr. Tomcik started Constantino on Gabapentin and Omeprazole.  (*Id*. at 522, 743.)

On February 9, 2016, Constantino saw Dr. Azar for treatment of bronchitis.   (*Id*. at 524.) She began a 10-day course of Amoxicillan.

On February 22, 2016, Constantino received an intravenous immune globulin ("IVIG") treatment.  (*Id*. at 339.)  She reported that she had recently taken Augmentin for 10 days for sinusitis,

4

with her last dose 4 days beforehand; she reported that it did provide relief, but she continued to have a fever, yellow drainage, nasal congestion, cough, chest tightness, and difficulty breathing. (*Id*.) On examination, she had nasal discharge on the left, bilateral maxillary tenderness, clear lungs, and no swelling or tenderness in her extremities.  (*Id*. at 340.)  Spirometry testing showed a FEV1 of 1.79 (64% of predicted) and a FVC of 2.17 (61% of predicted), consistent with moderate restriction. (*Id*. at 300.) She was diagnosed with acute sinusitis and given another 14 days of Augmentin to start if her sinus symptoms did not improve in the next 24 hours; she was also given Proventil inhaler to use as needed.  (*Id*. at 341.)

On June 10, 2016, Constantino sought treatment from rheumatologist Dr. Askari with complaints of pain in her back, hands, and elbows. (*Id*. at 361.)  She described morning stiffness with no significant increase in fatigue and weakness, sun sensitivity on her face and upper extremity, and generalized arthralgias especially in the neck, hands, knees, and feet with swelling appreciable in her hands, which she believed was unrelated to a lupus flareup.  (*Id*.)  She rated her pain severity as 6-7 out of 10. (*Id*. at 364.)  Examination revealed malar rash with hypo- and hyperpigmented lesions on her upper extremity, active synovitis in her hands, and bilateral pain on palpation of her knees without significant swelling; no abnormalities were noted in her neck, shoulders, elbow, hips, and ankles/feet. (*Id*. at 364-65.)  Dr. Askari noted that she was taking CellCept twice a day and Skelaxin twice a day as needed for lupus; she stopped taking Plaquenil after her ophthalmologist recommended it due to maculopathy, and methotrexate was held due to elevated liver function testing. (*Id*. at 365.) Dr. Askari started a Medrol Dosepak, increased her CellCept to three times a day, and started psoriasis treatment. (*Id*.)

5

On September 2, 2016, Constantino received an IVIG treatment.  (*Id*. at 480.)  She reported no infections or antibiotics since her last treatment. (*Id*.)  She was still getting migraines and took Imitrex 4 to 5 times per month.  (*Id*.)  She reported feeling like she could not catch her breath when she talked, and sometimes when she was just sitting down and not talking.  (*Id*.)  She had not tried using her rescue inhaler during these events. (*Id*.)  She also reported a recent increase in joint pain in her fingers and ankles. (*Id*.)  No abnormalities were noted on examination. (*Id*. at 481.)

On August 1, 2016, Constantino was treated by gastroenterologist Dr. Robert Cameron for abdominal pain.  Her physical exam showed no acute distress, no increased work of breathing or signs of respiratory distress, clear lungs, no edema in her extremities, epigastric tenderness but normal bowel sounds.  (*Id*. at 457.)

On August 8, 2016, Constantino received an IVIG treatment.  (*Id*. at 475.)  She reported having migraines, more recently in the past 2 weeks, associated with pain all over and nausea; she was taking Imitrex with good relief.  (*Id*. at 475.)  She reported about 3 headaches per week; she denied associated auras, double vision, or blurry vision.  (*Id*.)  She reported a cough for the past week, shortness of breath, difficulty breathing, and yellow nasal drainage from time to time. (*Id*.)  On examination, nasal turbinate edema was noted bilaterally with clear nasal discharge; lungs were clear bilaterally; and there was no swelling, tenderness, or edema in her extremities. (*Id*.)

On June 1, 2017, Constantino sought treatment from Dr. Askari for lupus and an injury to her left upper arm.  (*Id*. at 565-66; 784-85.)  She rated her pain severity as 7 out of 10.  (*Id*. at 567; 786.)  An x-ray of her humerus revealed no fracture or dislocation.  (*Id*. at 694.)

On August 3, 2017, Constantino had a follow up appointment with Dr. Azar.  (*Id.* at 803.)  His exam notes describe her as alert, oriented and in no distress, with an enlarged thyroid, no other

swollen glands or lymph nodes, clear lungs, no wheezing, normal heart rhythm, benign abdomen with no tenderness, no neurological deficit, and no muscular or joint pains. (*Id*. at 795.)

On August 11, 2017, Constantino had a follow up appointment with Dr. Azar. (*Id.* at 808.) Lab work run on blood drawn at her previous visit had indicated abnormal renal function. (*Id.*) She stopped taking CellCept, because Dr. Azar believed this was a side effect of the medication. However, Dr. Azar noted her rheumatologist did not believe it was a medication side effect, but could be an indication of disease. (*Id*. at 808-09.) She reported no other symptoms or complaints. (*Id*. at 809.)  Examination revealed "no change on exam or abnormal findings." (*Id*. at 815.)  Dr. Azar ordered updated lab testing to recheck the renal function and determine whether her abnormal renal functioning was caused by her lupus or was a side effect of her medications. (*Id*. at 815.)

On September 22, 2017, an x-ray of Constanino's chest revealed no focal infiltrate, pleural effusion, or evidence of pneumothorax. (*Id*. at 832.)

On October 17, 2017, a CT scan of Constantino's chest revealed no change in the nodule in the right lower lobe, no evidence of bronchiectasis, mild patchy air trapping predominantly in the bilateral lower lobes (which may represent a component of small airway disease), visualized thyroid gland was within normal limits, liver was enlarged with redemonstrate diffuse hypoattenuation, and multilevel degenerative changes. (*Id*. at 833-34.)

On December 18, 2017, Dr. Azar, Constantino's primary care physician for over 20 years, completed a "medical source statement," opining Constantino's prognosis was "good," but she had various severe or otherwise work-preclusive exertional, postural, and other limitations. (*Id*. at 905-909). Dr. Azar identified her symptoms as "generalized pains, headaches, neck, shoulders, elbows, hands, back, legs, knees, [and] feet [pain], fatigue, dizziness, tingling, insomnia, diarrhea,

[and] migraines." (*Id*. at 905.)  He opined her impairments would last "indefinitely."  (*Id*.)  He

opined that Constantino has the following physical limitations:

- can sit for 45 minutes and stand for 30 minutes at a time;

- can sit for less than 2 hours and stand/walk for less than 2 hours in an 8-hour workday;

- can walk one city block before needing to stop and rest;

- needs to change positions at will and walk around during the workday, as it is "very difficult for her to work;"

- sometimes needs to take unscheduled breaks during the workday;

- will be absent for 3 to 5 days due to muscle weakness, chronic fatigue, pain/paresthesias, numbness, migraines, and adverse effects of medications when she is symptomatic;

- needs to elevate her legs above horizontal for 50% of the workday due to fluid retention in her lower extremities;

- does not need a handheld assistive device for mobility;

- can rarely lift/carry less than 10 pounds;

- can rarely twist, stoop, and climb stairs;

- can never crouch or climb ladders;

- can use her hands for grasping, turning or twisting objects 25% of the workday;

- can use her fingers for fine manipulation 25% of the workday;

- can use her arms for reaching in front of the body 20% of the workday;

- can use her arms for reaching overhead 10% of the workday; and

- will likely be off-task more than 25% of the workday.

(*Id*. at 905-9.)  Dr. Azar opined that Constantino's impairments were not likely produce "good" days

and "bad" days; she has a blind spot in her vision due to prior Plaquenil use; she gets migraines from

8

exposure to fumes, smells, noises, and weather changes; her anxiety increases with stress, and she can get sick from exposure to people.  (*Id.* at 909.)

**C.  State Agency Reports - Physical Impairments**

On June 2, 2016, state agency reviewing physician Dr. Elizabeth Das reviewed the record and determined that Constantino had three severe impairments: diffuse diseases of connective tissues, affective disorders, and anxiety disorders. (*Id.* at 93, 97.)  Dr. Das opined that Constantino had a was limited to light work, with the following postural limitations:

- •  never climb ladders, ropes or scaffolds;

- •  occasionally climb ramps and stairs; and

- •  frequently stoop, kneel, crouch, and crawl.  (*Id*. at 95-96.)

She also opined that Constantino should avoid even moderate exposure to fumes, odors, dusts, gases, etc. and hazards.  (*Id*. at 96.)

On September 29, 2016, state agency reviewing physician Dr. William Bolz agreed with the limitations assessed by Dr. Das, except he added the additional limitation of occasional balancing. (*Id*. at 111-12.)

**D.  Hearing Testimony**

During the January 30, 2018 hearing, Constantino testified to the following:

- •  She recently moved from Mayfield Heights, Ohio to Novelty, Ohio.  (*Id*. at 22.)

- •  She attended high school and college.  (*Id*. at 23.)

- •  She has a valid driver's license and drives a couple of times a week, but doesn't like driving.  She purchased a car with a lot of sensors on it because she finds them helpful.  She sometimes experiences pain in her back and arms when she drives, and the pain sometimes prevents her from driving.  (*Id*. at 23-4.)

9

- Prior to her disability, she was working as a pharmacy technician at CVS. Throughout her last year of employment, she was struggling with pain, fatigue and infections.  (*Id*. at 27.)

- Her common variable immunodeficiency and manospinine [sic] leptin deficiency began in 2004.  Initially, it landed her in the hospital on a respirator.  Once she was diagnosed and had a treatment plan, it continued to affect her ability to work because she was more vulnerable to infections.  Between 2004 and 2015, she averaged four to seven infections a year, which were treated with 21-day courses of antibiotics.  (*Id*. at 27-8.)

- The IV/IG treatment also gave her migraines, although her migraines began in high school, prior to the treatment.  (*Id*. at 28.)

- Her migraines got progressively worse until she quit work.  She believes they improved because she had less stress and less exposure to germs. (*Id*. at 29.)

- She still gets two or three migraines a week.  They last between one and five days. They never last less than a full day.  (*Id*. at 29-30.)

- She treats her migraines with Imitrex, which "helps pretty good."  She defined this as meaning that she always has somewhat of a headache, even when she doesn't have a migraine.  She always needs a cold cloth on her forehead.  The Imitrex doesn't make the migraine go away, but it makes it "workable."  (*Id*. at 30-1.)

- She has been in a couple of car accidents, which caused neck and back problems. The first accident occurred when she was 18.  She also has deteriorated discs in her neck.  These problems cause her to have daily pain that typically ranges from a six to a nine on a scale of one to ten.  (*Id*. at 31.)

- She does not take prescription pain medication, by choice.  She takes Advil, usually three at a time.  It somewhat brings down the pain.  She also ices it and rests.  (*Id*. at 32.)

- Her pain has gotten worse over the years.  Her doctors have recommended surgery, but she has not done it because of her immune system and her lupus.  She believes that because of her manospinine leptin she shouldn't have titanium in her body. (*Id*. at 33.)

- Her lupus flares a couple of times a month.  She used to be treated with Plaquenil, but had to be taken off of it because of a blind spot in her eye.  She is now treated with CellCept.  (*Id*. at 33-4.)

- She is starting to experience problems with her kidneys and numbness in her hands, fingers, and arms.  If she stands too long, her feet go numb.  (*Id*. at 34.)

- She also has peripheral neuropathy, which affects her ability to use her hands.  She experiences pain when she drinks from a cup, and she had difficulty sometimes with zippers.  (*Id*. at 35-6.)

- She lives with her boyfriend.  (*Id*. at 36.)

- She thinks she could lift up to 10 pounds.  (*Id*. at 37.)

- She has asthma, which she treats with both prescribed dosage and rescue inhalers.  (*Id*.)

- She also takes Zoloft for depression and anxiety.  She describes her depression as moderate to severe.  (*Id*. at 38-9.)

- She does very little around her house because she frequently needs to rest.  She does some laundry "maybe once a week."  If she cooks or does dishes, she needs to nap for a couple of hours.  She naps every day.  She grocery shops with her boyfriend once a month.  (*Id*. at 39.)

- Her work at CVS was part time, but more hours than she had ever worked before.  During that time she had more infections, more pain, and more exhaustion.  (*Id*. at 40.)

- She can generally sit for only about 45 minutes at a time before she needs to get up and stretch, and can only stand for 30 to 45 minutes before she needs to rest.  (*Id*. at 41.)

- She feels she could not work a full time, seated job because of the pressure in her neck and back, numbness in her hands and fingers, her fatigue, and her inability to be around sick people.  (*Id*. at 42.)

The VE testified Constantino had past work as a pharmacy technician.  (*Id*. at 46.)  The ALJ then posed the following hypothetical question:

> [I]magine a hypothetical individual with Ms. Constantino's vocational profile who is limited to the performance of light work as defined under the regulations, except she can never climb ladders, ropes or scaffolds.  She can occasionally climb ramps or stairs and balance.  She can frequently stoop, kneel, crouch and crawl.  She is limited to frequent handling and fingering with the upper extremities.  She should avoid even moderate exposure to fumes, odors, dust, gasses and poorly ventilated

11

areas.  And she should avoid moderate exposure to hazards such as dangerous machinery and unprotected heights.  This individual would further be limited to routine tasks with no strict time demands, no production quotas, and no more than occasional changes in the work setting.

. . . .

And finally, the individual is limited to occasional interaction with supervisors, coworkers and the public. . . . would the hypothetical individual be able to perform Ms. Constantino's past work?

(*Id*. at 47-8.)  The VE testified the hypothetical individual would be able to perform Constantino's past work as a pharmacy technician.  (*Id*. at 48.)

Next, the ALJ posed a second hypothetical, adding the limitation that the hypothetical individual should be afforded to alternate positions between sitting and standing at approximately 30-minute intervals.  The individual would not leave their workstation, and there would be no loss in productivity.  (*Id*. at 48.)  The VE stated that his testimony would remain the same.  (*Id*. at 49.)

The ALJ posed a third hypothetical, discarding the limitation of alternating positions defined in the second hypothetical, and adding the limitation that the individual was limited to a sedentary level of exertion as defined under the regulations.  (*Id*.)  The VE explained the hypothetical individual would not be able to perform Constantino's past work, but would be able to perform other representative jobs in the economy, such as a printed circuit board touch up screener, a final assembler, or a lens inserter.  (*Id*. at 49-50.)

The VE also opined that less that 15 percent of time off task and one day of unexcused absence per month would not affect job retention.  (*Id*. at 51.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any

12

medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).1

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *&* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Constantino was insured on her alleged disability onset date, December 28, 2015, and remained insured through March 31, 2021, her date last insured ("DLI.") (Tr. 59.) Therefore, in order to be entitled to DIB, Constantino must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured requirements of the Social Security Act through March 31, 2021.

2.   The claimant has not engaged in substantial gainful activity since December 28, 2015, the alleged onset date.

3.   The claimant has the following severe impairments: asthma, cervical degenerative disc disease with radiculopathy, systemic lupus erythematosus, migraine headaches, common variable immune deficiency/Mannose-binding lectin deficiency, depressive disorder, anxiety disorder, and post-traumatic stress disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20CFR 404.1567(b), except that she should be afforded the opportunity to alternate positions between standing and sitting at approximately 30-minute intervals; she can never climb ladders, ropes or scaffolds; she can occasionally climb ramps or stairs and balance; she can frequently stoop, kneel, crouch and crawl; she is limited to frequent handling and fingering bilaterally; she should avoid even moderate exposure to fumes, odors, dust, gasses and poorly ventilated areas; and she should avoid moderate exposure to hazards such as dangerous machinery and unprotected heights. Claimant is further limited to routine tasks with no strict time demands, no production quotas, and no more than occasional changes in the

14

work setting; she is limited to occasional interaction with supervisors, coworkers and the public.

6.    The claimant is capable of performing past relevant work as described below. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.    The claimant has not been under a disability, as defined in the Social Security Act, from December 28, 2015 through the date of this decision.

(Tr. 59-82) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Constantino asserts that the ALJ erred by failing to properly evaluate medical opinion of her long time primary care physician, Dr. Nabil Azar, consistent with the regulations, agency policy and Sixth Circuit precedent. (Doc. No. 15 at 1.) She notes that Dr. Azar's opinion contains greater, and far more detailed, limitations than contained within the ALJ's RFC finding. (*Id.* at 16.) She argues that the ALJ failed to give legally sufficient reasons for rejecting Dr. Azar's opinion, and that he erred in relying on medical opinions from reviewing physicians who did not have the opportunity to consider Dr. Azar's opinion or a significant quantity of additional medical records. (*Id.* at 18, 24.)

Respondent asserts that the ALJ's decision rests upon substantial evidence. (Doc. No. 17 at 8.) He notes that Constantino objects to only one aspect of the ALJ's long and detailed decision, and asserts ALJ properly and reasonably declined to give controlling weight to Dr. Azar's opinion as part of his overall weighing of the evidence and final decision because it was inconsistent with other substantial evidence. (*Id.* at 10.) He argues that the ALJ appropriately excluded that part of Dr. Azar's opinion which encroached on the determination of disability, which is a matter reserved for the Commissioner. (*Id.* at 11-12.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[3] However, "a finding that

---

[3]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27,

17

a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[4]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234,

---

2017).  Constantino filed her application on January 22, 2016, and therefore this Court applies the Rules in effect on that date.

[4]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[5]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we

19

will determine that you are disabled." *Id*.  It is the Commissioner who must make the final decision

on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v.*

*Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

> The ALJ addressed Dr. Azar's opinion as follows:
>
> The undersigned gives limited weight to the opinion of the claimant's treating physician, Nabil Azar, M.D., dated December 18, 2017.  The doctor opined that the claimant's prognosis is good; she is limited to sitting for 45 minutes at one time; standing for 30 minutes at one time; she is able to stand/walk for less than 2 hours total per day; it is "very difficult for her to work"; she requires a job that permits shifting positions from standing, sitting, and walking; she will require unscheduled breaks; she is unable to function when symptomatic, and this occurs for three to five days; she requires foot elevation with prolonged sitting for 50% of the time due to lower extremity edema/fluid retention; she requires no ambulatory aids; she should lift less than 10 pounds rarely and no more; she should never to rarely perform climbing and postural activities; she is limited to grasping, turning and fine manipulation with her hands for 25% of the workday; she is limited to reaching in front to 20% of the workday; she is limited reaching overhead to 10% of the workday; she would be off-task 25% of the workday; she is incapable of even "low stress" work; she does not have good and bad days; she has a blind spot from Plaquenil; she has migraines from exposure to fumes, smells, noises, weather changes; she has anxiety from stress; and she is prone to sickness from exposure to others.
>
> . . . . As to the portion of the doctor's opinion suggesting difficulty with working in general, this portion encroaches on the ultimate issue of disability, which is reserved to the Commissioner. As to the remaining portions, the undersigned gives limited weight to this opinion because it is not entirely consistent with the doctor's own findings, other examination findings of record, and other medical opinions.

(Tr. 79) (internal citations omitted).  After this brief summary of his reasoning, the ALJ commenced

a page and a half of detailed explanation in which he specified particular examination records,

psychiatric evidence, imaging and testing, and other opinions of record which were inconsistent with

the severity of impairment in Dr. Azar's opinion.  He noted in part that:

> The doctor's treatment notes fail to support the level of limitation to which he opined.  For example, at exam on August 3, 2017, she was alert and fully

oriented; her neck revealed no enlarged thyroid lungs [sic]; her lungs were clear with no wheezing; se had no neurological deficits; she had no muscular or joint pains; and she was otherwise unremarkable throughout.  Her exam on August 11, 2017, was similarly unremarkable.

The other examination findings throughout the record, both physical and mental, do not support the degree of limitation to which the doctor has opined.  For example, at exam of February 22, 2016, the claimant was in no acute distress; she was comfortable and fully oriented; her lungs were clear without wheezing; and she had no edema, joint erythema, swelling, or tenderness in her extremities.  At exam on June 10, 2016, her neck was within normal limits; her bilateral range of shoulder motion was normal; her elbows had normal extension and flexion; her hands had active synovitis; her knees had pain on palpation, but no significant swelling; and her ankles and feet had normal range of motion.  At exam on August 1, 2016, her breathing was normal and her lungs were clear; she had some epigastric tenderness; and she was otherwise unremarkable throughout.  At exam of August 8, 2016, her breathing was normal and her lungs were clear; her extremities had no edema erythema, swelling or tenderness; and she was otherwise unremarkable throughout.  At the psychological consultative exam on April 27, 2016, her gait and posture were unremarkable.

* * * *

The imaging and testing of record does not contain objective evidence support significant functional limitations [sic].  The claimant reported good relief from inhalers and the record contains no evidence of hospitalizations related to pulmonary impairments. . . .

The opinion is also inconsistent with the weighted portions of the opinions of the state agency medical consultants, state agency psychological consultants, and the examining consultative psychologist.

(*Id*. at 79-80.)

The Court finds the ALJ articulated "good reasons" for rejecting Dr. Azar's opinion.  First, the ALJ's decision does not dismiss the entirety of Dr. Azar's opinion based on his statements that it will be very difficult for her to work.  (Doc. No. 15 at 20.)  Instead, the ALJ rejected only  the portion of the doctor's opinion suggesting "difficulty with working in general," as encroaching "on the ultimate issue of disability, which is reserved to the Commissioner."  (Tr. 79.)  The ALJ then

gave specific reasons why he believed the other limitations expressed in Dr. Azar's opinion were inconsistent with the record as a whole.  He explained that Dr. Azar's treatment notes from medical exams he performed in August 2017, four months prior to his 2017 opinion, are inconsistent with the expressed limitations.  (*Id.* at 79.)  On August 3, 2017, Dr. Azar examined Constantino and described her as alert, oriented and in no distress, with an enlarged thyroid, no other swollen glands or lymph nodes, clear lungs, no wheezing, normal heart rhythm, benign abdomen with no tenderness, no neurological deficit, and no muscular or joint pains.  (*Id*. at 803, 795.)  A week later, on August 11, 2017, Constantino had a follow up appointment with Dr. Azar because lab work run on blood drawn at her previous visit had indicated abnormal renal function.  (*Id.* at 809.)  She reported no other symptoms or complaints.  (*Id*. at 809.)  Dr. Azar examined Constantino, and noted "no change on exam or abnormal findings." (*Id*. at 815.)

The ALJ next looked to earlier treatment records from other sources during the relevant period.  He noted that records from her IVIG treatments in February and August 2016 described her as having clear lungs, and no swelling or tenderness in her extremities.  (*Id*. at 340, 475.)  In August 1, 2016, gastroenterologist Dr. Robert Cameron treated Constantino for abdominal pain.  Her physical exam showed no acute distress, no increased work of breathing or signs of respiratory distress, clear lungs, no edema in her extremities, epigastric tenderness but normal bowel sounds.  (*Id*. at 457.)

Dr. Azar's opinion offers no explanation for these inconsistencies.  Many ailments vary in intensity over time, but Dr. Azar's assertion that Constantino does not have "good" days and "bad" days forecloses this inference.[6]  The Sixth Circuit has found that inconsistencies between a treating

---

[6]     This statement is also internally inconsistent with Dr. Azar's statement elsewhere in the same medical opinion that Constantino's symptoms would cause absence

physician opinion and his/her own treatment records is a proper basis for rejecting a treating physician opinion. *See e.g., Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 549-550 (6th Cir. 2014) (finding ALJ properly rejected treating physician opinion where that physician's treatment notes "did not support his opinion" that the claimant had severe limitations and, in fact, "undermine[d]" his opinion); *Leeman v. Comm'r of Soc. Sec.*, 449 F. App'x 496, 497 (6th Cir. 2011) ("ALJs may discount treating physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes."); *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112  13 (6th Cir. 2010). *See also Oglesby v. Colvin*, No. 5:13CV61, 2014 WL 1156239 at *10 (N.D. Ohio March 21, 2014) (finding "the ALJ has clearly articulated his reason for giving little weight to the opinion of Dr. Schmitt, that is, Dr. Schmitt's dire conclusions regarding Plaintiff's limitations are not supported by his own treatment notes.")  Here, the ALJ identified specific inconsistencies between Dr. Azar's treatment notes and his opinion, and explained his conclusion that Dr. Azar's examination findings were inconsistent with his assessment of a wide array of severe physical functional limitations.[7]

Constantino further argues the ALJ erred because he "fail[ed] to adequately consider Dr. Azar's opinion under the regulations by considering 'the length, frequency, nature, and extent of the treatment relationship as well as the treating source's area of specialty and the degree to which the

---

"when she is symptomatic."  (Tr. 905-9.)  He offers no information regarding how frequently Constantino is symptomatic.

[7]     Constantino asserts that medical record evidence is in fact consistent with the standing and walking limitations Dr. Azar identified.  (Doc. No. 15 at 20.) However, she does not identify any specific records that support this assertion, or explain how the ALJ misinterpreted the records he found inconsistent with those limitations.  Neither party nor the Court identified any records of physical therapy or other common treatments for mobility impairments, and Dr. Azar expressly stated that Constantino did not need the aid of a handheld mobility device.

opinion is consistent with the record as a whole and is supported by relevant evidence.'" (Doc. No. 15 at 18, citing 20 C.F.R. §§ 404.1527(c)(2)-(6).) The Court disagrees. The ALJ specifically noted the treating source status of Dr. Azar, and the inconsistency of his opinions with the treatment notes, two of the factors listed at 20 CFR §404.1527. (Tr. 79.) While the ALJ is charged with considering the factors set forth at 20 CFR §404.1527 when evaluating medical opinion evidence, he is not required to articulate specific findings as to each of these factors. Indeed, neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by-factor analysis." *Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. Mar. 16, 2011).

Constantino also argues that the ALJ erred by giving greater weight to the opinions of non-treating physicians who were reviewing an incomplete record. (Doc. No. 15 at 23.) The ALJ accorded "great weight" to the opinions of state agency reviewing physicians Drs. Das and Bolz, both of whom reviewed the medical record and found Constantino was capable of a reduced range of light work. (Tr. 93-97, 111-12.) Constantino argues that because these physicians' opinions were offered in June and September 2016, they were unable to review the complete record and, therefore, failed to take into account her subsequent treatment history. However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec.*, No. 10 5025, 2011 WL 13918 at * 4 (6th Cir. Jan. 4, 2011). Rather, the Sixth Circuit requires only "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'" *Blakley*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)). *See also Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (stating *Blakley* requires "only that before an ALJ accords significant weight to the opinion

24

of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record. . .  In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny.")

Here, the ALJ expressly acknowledged and addressed medical evidence post-dating the opinions of Drs. Das and Bolz, including Dr. Azar's treatment notes from August 2017, as discussed *supra*.  Moreover, it is clear the ALJ subjected the state agency opinions to scrutiny because the ALJ stated that he disagreed in part with their assessments because the record that developed after September 2016, as well as Constantino's hearing testimony, supported additional sit/stand and manipulative limitations. (Tr. 77.)  Therefore, the ALJ adopted an RFC that provided greater postural and environmental restrictions than set forth in either Dr. Das's or Dr. Bolz's opinions.

Finally, Constantino asserts that the ALJ failed to support his RFC finding with substantial evidence because he did not "acknowledge or discuss that longtime treating physician Dr. Azar's opinion is patently consistent with and supported by the diagnosis of common variable deficiency." (Doc. No. 15 at 3; Doc. No. 18 at 3.)  However, the ALJ did identify CVID as a severe impairment, and discussed the symptoms Constantino identifies, including susceptibility to infections, throughout his decision (Tr. 59, 72.)  The ALJ also acknowledged Constantino's intravenous IVIG treatments, and discussed her lung function at length, identifying asthma as an additional severe impairment. (*Id.* at 59, 62, 71.)  Although Constantino asserts these treatments have "well documented side effects of migraines, extreme fatigue, body aches, nausea, diarrhea, and renal issues," she does not identify medical record evidence documenting this connection.  (Doc. No. 18 at 3.)  Nor does Constantino assert that the ALJ failed to consider Constantino's reports of these symptoms.  On the contrary, the ALJ noted that Constantino "reported fatigue after injections, but she did not

25

consistently report severe fatigue." (Tr. 63.) He noted multiple records in which Constantino reported she was not experiencing muscular or joint pains and demonstrated a normal range of motion. (*Id*.) The ALJ identified migraine headaches as an additional severe impairment, but noted that medical records reflect that the headaches varied in frequency and intensity, and that, once Constantino began treating them with Imitrex, she reported "good relief." (*Id*. at 71.)

Constantino directs this Court's attention to several parts of the record which she believes supports Dr. Azar's conclusion Constantino was, at most, capable of sedentary work. (Doc. No. 15 at 21-3.) While Constantino cites evidence from the record that could support a finding of disability, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

In light of the above, the Court finds the ALJ articulated "good reasons" for giving "limited weight" to Dr. Azar's opinion and, further, that those reasons are supported by substantial evidence. While Constantino urges the Court to find that the reasons given by the ALJ do not constitute "good reasons," it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, No. 09 2060, 2011 WL 1228165 at *2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, No. 07 5793, 2008 WL 162942 at *6 (6th Cir. Jan. 15, 2008) (stating that "it

26

squarely is not the duty of the district court, nor this court, to re-weigh the evidence. . . .")  Here, the ALJ provided clear and sufficient reasons for his rejection of Dr. Azar's December 2017 opinion and supported those reasons with reference to specific evidence in the record.  Constantino's argument to the contrary is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 2, 2021